# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

Johnathan M. Metellus,

     *Plaintiff,*

v.             **Case No. 3:16-cv-300**
             **Judge Thomas M. Rose**

Heather Wilson, Secretary of the United States
Air Force,1

     *Defendant.*

---

## ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF 30, AND TERMINATING CASE.

---

   Pending before the Court is Defendant's Motion for Summary Judgment. ECF 30. Therein, Defendant, Secretary of the Air Force, requests that the Court grant summary judgment on Plaintiff Johnathan M. Metellus's claims of race discrimination, hostile work environment and retaliation. Because Plaintiff has no direct evidence that Defendant's decisions not to promote Plaintiff were motivated by gender animus, and because he has no evidence to disprove Defendant's asserted non-discriminatory reasons for promoting others, and because there is no evidence of a hostile work environment, Defendant's motion will be granted.

---

1 Plaintiff's Complaint alleged Title VII violations and Intentional Infliction of Emotional Distress and named both the Secretary of the Air Force and the United States of America as Defendants. Because Plaintiff subsequently voluntarily dismissed his IIED claim (ECF 11), the sole proper remaining Defendant in this action is the Secretary of the Air Force. See 42 U.S.C. § 2000e-16(c); *Ramsey v. Mnuchin*, No. 1:15-cv-575, 2017 WL 2775114, at *1 n.1 (S.D. Ohio June 27, 2017) (only proper defendant in Title VII suit is head of agency).

## I.     Background

Plaintiff Johnathan M. Metellus was hired as a civilian cook supervisor in the summer of 2014 to oversee approximately 13 employees in the hospital kitchen at WPAFB Medical Center. Plaintiff began work in October 2014, but did not assume supervisory duties until December 2014 when he completed the required training.   Throughout his tenure, Plaintiff, an African-American male, reported directly to his first-line supervisor Master Sergeant Jerry Fondren, an African-American male, and second-line supervisor Lieutenant Colonel James Weinstein, a Caucasian male who oversaw the Medical Center's clinical nutrition and food services. (ECF 25, Weinstein Decl., ¶¶ 2–3 at PageID 262–631; ECF 26, Fondren Decl., ¶¶ 2–3 at 309.)

Plaintiff's supervisors were generally pleased with the quality of his work and food preparation.   He consistently received positive evaluations, was never disciplined, and never subjected to any adverse employment action. (ECF 25, Weinstein Decl., ¶4 at 263; ECF 26, Fondren Decl., ¶10 at 312.)   But Plaintiff's relationship with his subordinates was sometimes difficult.   Plaintiff believed his subordinates were too friendly with management and often insubordinate to him. (See, e.g., ECF 24, September 25, 2017 Deposition of Johnathan Metellus ("Metellus Dep. II"), Ex. 7 at 223; ECF 25, Weinstein Decl., Ex. F at 277–81.) They, in turn, chaffed at his managerial style and periodically complained to M. Sgt. Fondren and Lt. Col. Weinstein about how he treated them. (ECF 25, Weinstein Decl., ¶5 at 263; ECF 26, Fondren Decl., ¶10 at 312.)

Less than three weeks after starting, Plaintiff was confronted in the hallway by Sean Fennell, one of the kitchen cooks.   Fennell, upset that Plaintiff repeatedly belittled him in front of customers, yelled: "You are this close to me taking you out," and "How does it feel to be

embarrassed in public now." (ECF 26, Fondren Decl., Ex. A at 315–19.) Several individuals including M. Sgt. Fondren and Lt. Col. Weinstein observed the exchange. (Id.) Weinstein instructed Fondren to collect witness statements and sent Fennell home until Civilian Personnel could be contacted. (Id. at 315.) When Fennell returned to service, he apologized to Plaintiff several times and continued to work in the kitchen. (ECF 25, Weinstein Decl., ¶6 at 263.)

The USAF disciplined Fennell in accordance with its policies, which require the first-level supervisor to propose discipline action and the second-level supervisor to approve the final decision. (ECF 27, Declaration of Monica Bryant-McGuire ("Bryant-McGuire Decl."), ¶3 at 364–65.) Because Plaintiff had not completed his supervisory training, responsibility for Fennell's discipline fell to Fondren and Weinstein, who were serving as Fennell's first and second-level supervisors, respectively. (ECF 26, Fondren Decl., ¶5 at 310–11.) Fondren consulted with Monica Bryant-McGuire from Civilian Personnel and shared with her the witness statements he had collected. (ECF 27, Bryant-McGuire Decl., ¶5 at 365.) While Plaintiff had requested that Fennell be terminated or suspended, an option Fondren and Weinstein considered, Bryant-McGuire determined that, under the USAF's progressive discipline policy, the appropriate discipline for Fennell's outburst was an oral admonishment. (Id.; ECF 26, Fondren Decl., Ex. O at 350.) She stated that she assessed Fennell's statements against the *Metz* factors and concluded that they did not constitute a true threat. See *Metz v. Dep't of Treasury*, 780 F.2d 1001 (Fed. Cir. 1986). Her recommendation also took into consideration Fennell's clean disciplinary record. (ECF 27, Bryant-McGuire Decl., ¶5 at 365.) Bryant-McGuire, an African-American, was not even aware of Plaintiff's race at the time or the color of either Plaintiff or Fennell, who is Caucasian. (Id.)

M. Sgt. Fondren and Lt. Col. Weinstein followed Civilian Personnel's recommendation. An oral admonishment issued on November 17, 2014 and was entered onto Fennell's permanent record. (ECF 26, Fondren Decl., Ex. D at 322.) Fondren also sent letters to Plaintiff and Fennell informing them of the availability of counseling services through the Employee Assistance Program. (ECF 26, Fondren Decl., ¶4 at 310.) During the two and half years he served as Fennell's direct supervisor, Plaintiff never had to discipline him and even nominated him as employee of the quarter. (ECF 24, Metellus Dep. II, 10:25–12:2 at 166.) While Plaintiff alleges that he orally requested a transfer following the incident to avoid working alongside Fennell, he never pursued that option or submitted a written request. (ECF 25, Weinstein Decl., ¶15 at 266.)

Plaintiff also alleges that Defendant racially discriminated against him by undermining his supervision of his Lead Cook, Christian Budzinack. Budzinack resigned after only eight months, when the USAF initiated removal proceedings against him at the behest of Plaintiff and with the support of Civilian Personnel.

Plaintiff's issues with Budzinack began shortly after Plaintiff's arrival at WPAFB. Plaintiff documented his initial concerns in a letter of counseling that he issued to Budzinack on December 8, 2014. The letter charged that Budzinack's actions were disrespectful and were undermining Plaintiff's authority in front of the other kitchen staff. (ECF 24, Metellus Dep. II, Ex. 7 at 223.) Plaintiff elected not to pursue discipline at this point, even though it was within his discretion (and his responsibility) as first-level supervisor to do so.

Around this time, Plaintiff also suspected that Budzinack was drinking on the job. He raised this concern with Lt. Col. Weinstein. After consulting with Human Resources, Weinstein emailed an alcohol observation checklist to Plaintiff along with instructions on how to document

his suspicions. (ECF 25, Weinstein Decl., Ex. A at 267-69.)   Plaintiff never raised the issue with management again nor documented the concern in his letters of counseling or his memoranda regarding Budzinack's performance.   Plaintiff concedes that he never submitted a completed form because he was not able to fully verify that Budzinack was drinking on the job. (ECF 24, Metellus Dep. II, 34:15–35:1 at 172.)

Plaintiff continued to find fault with Budzinack's attitude and proficiency as a cook.   In January 2015, he drafted a second counseling letter detailing Budzinack's shortcomings and perceived insubordination over the previous month. He sent a draft of the letter to Lt. Col. Weinstein and asked that the Colonel "make recommendation if necessary and we can discuss." (ECF 25, Weinstein Decl., Ex. B at 270-73.)   Weinstein did not make any recommendations.   He reminded Plaintiff that responsibility for discipline fell to Plaintiff as the first-level supervisor and that Civilian Personnel would assist him as needed. (Id., ¶11 at 264.)   Several weeks later Plaintiff issued Budzinack a final version of the counseling letter, identical to the draft he had circulated to Weinstein. (ECF 24, Metellus Dep. II, Ex. 9 at 226–28.)

In March 2015, Plaintiff drafted a negative performance review for Budzinack that marked him deficient in 4 of 5 categories and listed his overall performance as unacceptable. (ECF 27, Bryant-McGuire Decl., Ex. C at 379.)   M. Sgt. Fondren, as Budzinack's second-level supervisor, reviewed the rating and did not feel comfortable signing the report because he felt there was not adequate documentation at the time to support the rating. (ECF 26, Fondren Decl., ¶8 at 311.) On the advice of Civilian Personnel, M. Sgt. Fondren drafted his own review and Lt. Col. Weinstein submitted the non-concurring appraisals. (Id.; ECF 25, Weinstein Decl., ¶13 at 265.) Before the final appraisals could be given to Budzinack, however, Plaintiff voluntarily elected to withdraw

and shred his review in order to avoid any unnecessary tension. (ECF 24, Metellus Dep. II, 41:5–15 at 174.)  Weinstein instructed Plaintiff on multiple occasions that he was not required to withdraw his review and that it was incumbent that he submit the appraisals he thought appropriate.  Weinstein documented these conversations in two contemporaneous memorandums for the record. (ECF 25, Weinstein Decl., Ex. D & E at 275, 276.)

After the review period, Plaintiff began documenting his discussions and concerns in Budzinack's Personnel File. (See ECF 27, Bryant-McGuire Decl., Ex. C at 380-83.)  He also sought guidance from Monica Bryant-McGuire of Civilian Personnel on how to remove Budzinack.  In May 2015, he emailed her a three-page memorandum outlining his case for Budzinack's removal. (Id.)  The memorandum attached a copy of the withdrawn performance review and an excerpt of Budzinack's Personnel File documenting ten counseling sessions since March 19, 2015. (Id.)  Bryant-McGuire requested additional detail, which Plaintiff provided in a two-page memorandum and a follow-up email attaching photos of food that Budzinack had prepared, and which Plaintiff deemed not acceptable to serve. (Id., Ex. E & F at 391–93, 394– 97.)  Bryant-McGuire reviewed the material and determined that removal would be an appropriate employment action in light of the concerns about Budzinack's performance.  She relayed her recommendations to M. Sgt. Fondren along with the supporting documentation. (Id., ¶7 at 366–67.)  Because Plaintiff was going on leave, Fondren was going to serve as the first-level supervisor for the proposed action.  Before removal was finalized, however, Budzinack resigned rendering the issue of his removal moot. (Id.)

Besides Fennell and Budzinack, in his two and half years at WPAFB, Plaintiff butted heads with nearly every employee under his supervision.  Plaintiff's employees would sometimes bring

their complaints about his management style to Fondren and Weinstein. (ECF 25, Weinstein Decl., ¶5 at 263; ECF 26, Fondren Decl., ¶10 at 312–13.)   Most of the complaints took issue with Plaintiff's condescending tone to his subordinates and did not rise to the level of actionable conduct. (Id.)   In many cases, Fondren reminded the employees that Plaintiff was their supervisor and urged them to address the problem with him first. (Id.)   In August 2016, however, Kellie Gerber submitted a written complaint to Fondren that he was compelled to investigate. (ECF 26, Fondren Decl., ¶12 & Ex. L at 313, 337–38.)

Gerber alleged that Plaintiff had insisted she cook her soup in a large kettle rather than the smaller stockpot that she had previously been using without complaint.   Because of her stature, Gerber did not feel safe using the larger kettle and worried that she would burn herself or those around her. (Id.)   When she communicated this fear to Plaintiff, he responded by writing in her personnel file that she was unable to follow supervisor instructions.   Her complaint also stated that she found Plaintiff intimidating, that workplace morale was "low to non-existent," and that Plaintiff had on several occasions asked her "some very personal questions about [her] private life outside of the workplace that made [her] feel uncomfortable." (Id.)

After consulting with Civilian Personnel, M. Sgt. Fondren investigated the claims, which were partly corroborated by other staff members. (Id., Ex. M at 339-41.   For example, Michelle Arantz, an African-American employee, complained that Plaintiff had barred the kitchen staff from attending the work Christmas party and that he "goes out of his way to make us miserable." (ECF 26, Fondren Decl., Ex. F at 325.)   Similarly, Rosemarie Bozard, a Filipino employee, wrote to M. Sgt. Fondren to complain that Plaintiff had unfairly accused her of abusing sick leave.   She stated that: "I felt it was very demeaning and am very frustrated that no matter how hard we work,

Metellus is always quick to criticize and counsel but seldom ever provides praise." (Id., Ex. G at 326.)

On August 24, 2016, Fronden issued Plaintiff an Interim Notice of possible administration action. (Id., Ex. N at 342.)   The Notice was non-disciplinary, and simply put Plaintiff on notice that he could face discipline if it was determined he was negligent in the performance of his duties. (Id.)   The investigation proved inconclusive, however, and Plaintiff was never subjected to any discipline or other negative employment action. (Id., ¶14 at 314.)

Two days after receiving the Interim Notice, Plaintiff requested a new supervisor.   He complained to Lt. Col. Weinstein that M. Sgt. Fondren's personal relationship with the employees created an "undue hardship" in the performance of his duties and charged that Fondren was conspiring against him. (ECF 25, Weinstein Decl., Ex. F at 277.)   After consulting with his Superintendent and Civilian Personnel, Weinstein did not switch out supervisors because he felt that Fondren was doing a good job and because no other supervisors were available. (Id., ¶14 at 265.)   Plaintiff remained under Fondren's supervision without incident for the remainder of his time at WPAFB

Plaintiff continued to apply for other jobs as he had prior to starting at WPAFB and throughout his time there.   All told, he applied for approximately 16 to 18 federal service jobs in two and half years. (ECF 24, Metellus Dep. II, 77:2–5 at 183; 84:7–10 at 184.)   In July 2017, he accepted a position as a Cook Supervisor at Yakota Air Base in Japan, where he currently works.

Plaintiff primarily applied for jobs through the USAJOBS website, which hosts government and military openings and allows applicants to apply online. (Id., 84:11–88:20 at 184–85.)   Plaintiff submitted the same resume and reference list to the majority of those jobs.   He also

separately listed his first-level supervisors for his past and present jobs. (Id., 85:9–86:12 at 185; 90:5–13 at 186.) In response to an application for a U.S. Army cook posting in Yongsan, South Korea, he received a response that he was "[i]neligible for further consideration for this position and grade based on [the] results of your referral." (ECF 28, Koller Decl., Ex. A at 414–15.) Plaintiff assumed this notification meant that he was not hired because he was given a negative reference. (ECF 24, Metellus Dep. II, 78:1–15 at 183.) Within the USAJOBS system, however, "referral" is a term of art that refers to a reviewing agency's determination to certify an applicant's entire application package, and specifically the resume. It does not indicate an issue with the applicant's job references or letters of reference. (ECF 29, Willingham Decl., ¶3 at 416.) Plaintiff never followed up to determine the issue with this application packet, nor solicited or received any feedback for any of the other positions for which he was not hired. (ECF 24, Metellus Dep. II, 81:16–82:18 at 184.)

## II. Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    Analysis

## A.    Discrimination

Title VII of the Civil Rights Act of 1964 prohibits federal agencies from employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). It is a violation of Title VII to fail to promote an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005). Plaintiff asserts he was discriminated against because of his race.

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). Plaintiff has no direct evidence that any of the actions of which she complains were motivated by race, leaving only the

avenue utilizing circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) to survive summary judgment.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. To establish a *prima facie* case of discrimination based on a "failure to promote" theory, a plaintiff must demonstrate that:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White*, 429 F.3d at 240. A plaintiff's burden at the *prima facie* stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Plaintiff's racial discrimination claim fails at the initial *prima facie* stage because he has not adduced any evidence that he was subjected to any negative employment outcome or that he was treated differently than similarly-situated, non-protected employees.

To satisfy the second prong of a *prima facie* case, a plaintiff must show that he suffered an "action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision

causing a significant change in benefits." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008). Here, Plaintiff suffered no adverse employment action. He was not fired, demoted, reassigned, or denied a promotion. Throughout his time at the base, he maintained his position, pay, and core job responsibilities, and even received time off bonuses in both 2015 and 2016. (ECF 26, Fondren Decl., ¶10 at 312.) The injury about which he complains—undermining of his supervisory authority—does not qualify as significant change in his employment status and is not actionable as a Title VII discrimination claim. See, e.g., *McGinnis v. U.S. Air Force*, 266 F. Supp. 2d 748, 768–69 (S.D. Ohio 2003) (negative performance review was not adverse action because plaintiff did not suffer a demotion, termination, or a loss in benefits due solely to that evaluation); *Joiner v. Ohio Dep't of Transp.*, 949 F. Supp. 562, 567 (S.D. Ohio 1996) (no adverse employment action where grade level, salary, and benefits remained the same, despite evidence of loss of overtime and supervisory responsibilities).

Second, even if Plaintiff was subjected to some actionable negative employment outcome, Plaintiff still cannot make out a *prima facie* case because there is no evidence that he was treated differently than similarly situated non-protected employees, and thus no inference that any action taken against him was motivated by race. In order to create a valid comparison, a plaintiff must first establish that the comparable employees were "similarly situated in all relevant respects." *Wright*, 455 F.3d at 710. Individuals with whom the plaintiff seeks to compare his treatment "must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff proposes three potential comparators—Sean Fennell, Christian Budzinack, and Kellie Gerber. But these employees are not similarly situated to Plaintiff. They all served under Plaintiff and were not subjected to the same work standards or supervisory structure as Plaintiff. Nor did they engage in similar conduct to Plaintiff. In fact, because none of them exercised supervisory authority over any individuals, the primary thrust of Plaintiff's complaint—that his supervisory authority was undercut by management—is inapplicable to their situation. Without proper comparators, Plaintiff is unable to establish any inference that he was subjected to actions based on his race. Indeed, all evidence points to the contrary. Both M. Sgt. Fondren, his first level supervisor, and Monica Bryant-McGuire, the Civilian Personnel contact who handled Fennell's discipline and Budzinack's removal, are African-American. Both deny that race was a motivating factor in any of their decisions. Moreover, Plaintiff's personality conflicts with his staff were not limited to his white employees, but extended to the African-American and Filipino employees, including Michele Arantz, Debra Smith, William Smith, and Rosemarie Bozard. (ECF 26, Fondren Decl., ¶10 at 312-13.)

Even if Plaintiff could establish a *prima facie* case of employment discrimination based on the personnel actions directed at those serving under him, summary judgment is still appropriate because the actions about which Plaintiff complains were taken pursuant to the USAF's policies for legitimate, nondiscriminatory reasons. See *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53-55 (2003) (holding that application of neutral policy constitutes quintessential legitimate, nondiscriminatory reason for employment action). Nor has Plaintiff adduced any evidence showing that these reasons were pretextual.

For instance, it is undisputed that Fennell was issued an oral admonishment in accordance with the USAF's policy on progressive discipline. Civilian Personnel determined that that discipline was appropriate given Fennell's otherwise spotless record and the nature of the conduct, which did not rise to the level of a true threat under *Metz*. (ECF 24, Bryant-McGuire Decl., ¶5 at 365.) Similarly, the evidence establishes that Budzinack's case was handled pursuant to the USAF's policies. While Plaintiff claims Defendant racially discriminated against him by not accepting his March 2015 review of Budzinack, USAF policies do not require a second-level supervisor to blindly accept a performance review that he or she believes lacks supporting documentation. (Id., ¶4.) M. Sgt. Fondren's decision to submit his own rating along with Plaintiff's was not based on a discriminatory animus toward Plaintiff, but on his own assessment of Budzinack's performance and a lack of documentation to support Plaintiff's assessment. (ECF 26, Fondren Decl., ¶8 at 311.) Moreover, neither M. Sgt. Fondren nor Lt. Col. Weinstein ever altered Plaintiff's review. Plaintiff conceded at deposition that he voluntarily withdrew his review to avoid creating any undue tension. (ECF 24, Metellus Dep. II, 41:5–15 at 174.)

**B.    Hostile Environment**

To prevail on a hostile work environment claim, a plaintiff must establish that: "(1) she belonged a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). To determine whether conduct is actionable, a court must consider the totality of the circumstances "including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Harassment is "based on race when it would not have occurred but for the plaintiff's race." *CSX Transp. Co.*, 643 F.3d at 511. While harassing conduct need not be overtly racist to qualify, a plaintiff must produce either "(1) direct evidence of the use of race- specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." Id. Plaintiff has no evidence of a hostile work environment or racial animus directed toward Plaintiff.

First, Plaintiff has not produced any evidence that he was subjected to any discriminatory conduct, let alone conduct that was so severe or pervasive that it altered the conditions of his employment. He was never threatened, humiliated, or ridiculed by his supervisors. And while he clashed on occasion with his subordinates, management issued appropriate discipline when those concerns were brought to its attention. Notably, Plaintiff's primary complaints are not about any actions directed at him, but stem from his perception that management was too friendly with and too lenient on other employees, especially Fennell and Budzinack. Plaintiff's argument ignores, however, that these employees were subjected to disciplinary and removal proceedings in accordance with USAF policy. Even if that were not the case, a reasonable person would not construe such leniency as harassment directed at Plaintiff.

Second, there is no evidence that any unwelcomed conduct was based on race. Plaintiff was not subjected to any racially charged or derogatory terms. The actions he complains about were spearheaded by M. Sgt. Fondren and Bryant-McGuire, both of whom are African-American. While his subordinates did not see eye to eye with him, these complaints came from white and

black employees alike and were driven by his domineering personality and not the color of his skin. (ECF 26, Fondren Decl., ¶10 at 312.)   Contrary to his allegation that white employees under his purview were treated better than black employees, it appears that all employees were treated in accordance with USAF policy.   Moreover, these employees are not similarly-situated to Plaintiff, and there is no evidence that their treatment would have been different but-for Plaintiff's race. See *CSX Transp. Co*., 643 F.3d at 511.

"The most fundamental problem with the allegations [Plaintiff] makes with respect to these individuals is that they fail to establish that the complained-of actions were based on [Plaintiff's race].   None of the allegations made by [Plaintiff] contain any hint of facts that would permit a rational factfinder to infer that [race] animus played a part in what appear to have been garden-variety personality conflicts between people…working in close quarters." *Perkins v. Harvey*, 368 Fed. App'x 640, 646 (6th Cir. 2010).   The United States Supreme Court has noted that harassing conduct "must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).   "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Id.* (citation and internal quotation marks omitted).   "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* (internal quotation marks omitted).   Far from running afoul of a civility code, the actions Plaintiff describes appear well within most civility codes, not to mention the pale established for hostile environment claims.

**C.**     **Retaliation Claim**

Title VII forbids employer actions that discriminate against an employee because the employee participated in protected activity, such as an EEO investigation. *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 59 (2006). Where a plaintiff relies on indirect evidence to establish his claim, the familiar *McDonnell-Douglas* burden-shifting framework applies. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Id. To satisfy the third prong, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Ry.*, 548 U.S. at 67–68 (internal quotation omitted). The standard is objective and does not protect a plaintiff from trivial harms, such as petty slights, minor annoyances, and a simple lack of good manners, which are not likely to deter victims from complaining to the EEOC. Id. at 68.

Here, Plaintiff claims that the USAF's retaliation against him for engaging in protected EEO was reflected in that "his significantly diminished…supervisory responsibilities were significant and contributed to the seeking and acceptance of alternate employment for lower pay." (ECF 32, Mem. in Opp'n at PageID 447.) However, Plaintiff maintained all supervisory duties at the base until he accepted his new position at Yokota Air Base in July 2017.

Plaintiff's supervisory duties consisted of daily oversight of the kitchen staff, the responsibility to recommend performance ratings, and the responsibility to recommend

"appropriate recognition and corrective action, as needed, in performance management." (ECF 24, September 25, 2017 Deposition of Johnathan Metellus, Ex. 17 at PageID 244.) Plaintiff continued to submit performance ratings for all members of the kitchen staff, including an unsatisfactory rating for a Caucasian employee that management upheld. (ECF 33, Weinstein Suppl. Decl., ¶2 at PageID 459 & Ex. A–B at PageID 461–63.) He recommended commendations for his employees under his supervision as he saw fit, and took on the more mundane supervisory tasks, such as apprising employees of their grievance rights and the location of the number for their union representatives. (Id., ¶2 at PageID 459 & Ex. C–D at PageID 464–68.) Finally, Plaintiff maintained his responsibility for recommending corrective actions to address performance and conduct issues, as evidenced by the successful corrective actions he pursued against Budzinack and Kellie Gerber. Far from being stripped of his supervisory powers, Plaintiff initiated removal proceedings against Budzinack. (ECF 24, Metellus Dep. II, 41:5–55:3 at PageID 174–77.)

Had he been denied his supervisory powers as part of a scheme to protect Caucasian employees, Plaintiff is unlikely to have been able to force Budzinack's resignation. While Plaintiff now claims that he felt that his performance review of Budzinack was overridden, he admitted at deposition that he voluntarily withdrew his review of Budzinack in order to avoid tension, rather than submitting both his review and Sgt. Fondren's non-concurring review to Civilian Personnel as Lt. Col. Weinstein had proposed. (ECF 24, Metellus Dep. II, 41:5-15 at PageID 174.)

Similarly, while Plaintiff complains that M. Sgt. Fondren initiated an investigation based on Gerber's written complaint, that investigation upheld Plaintiff's supervisory authority,

including Plaintiff's decision to document his concern in Gerber's 971 Personnel Folder. (Id., 70:4-13 at PageID 181; ECF 26, Fondren Decl., ¶14 at PageID 314.)

Plaintiff has failed to adduce any evidence that he was not hired for a position because of a negative job reference. Plaintiff was never informed that he was not hired because of a negative reference, nor did he ever contact anyone to follow-up on the positions for which he was not selected. (ECF 24, Metellus Dep. II, 81:16–82:18 at 184.) The evidence upon which he bases this claim is an automated message he received though his USAJOBS account regarding his application for a position at Yongsan Army Base. That message stated that he was "[i]neligible for further consideration for this position and grade based on [the] results of [his] referral." (ECF 28, Koller Decl., Ex. A at 415.) While Plaintiff interpreted this to mean that he was not selected because of a negative reference, "referral" is actually a term of art that denotes the applicant's entire application package, specifically the resume. (ECF 29, Willingham Decl., ¶3 at 416.) The message does not indicate that Plaintiff received a negative reference. The computer could have deemed him ineligible for any number of reasons.

Even if Plaintiff had adduced evidence that he was denied a position because of a negative job reference, there is no evidence that a negative job reference came from a supervisor. Plaintiff listed other character references on his applications, and neither M. Sgt. Fondren nor Lt. Col. Weinstein were ever asked for a reference for Plaintiff. (ECF 26, Fondren Decl., ¶16 at 314; ECF 25, Weinstein Decl., ¶16 at 266.)

Plaintiff's claim that the USAF undercut his supervisory responsibilities by denying his oral request for a transfer following the Fennell incident ignores that the alleged transfer request predated him assuming supervisory responsibilities. Even if the USAF had denied a valid

transfer request to an open position, the case law is clear that denial of a lateral transfer in these circumstances does not constitute an adverse employment action. See *Henry v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 162 F. Supp. 2d 794, 801 (S.D. Ohio 2000).

Plaintiff also claims that Defendant retaliated against him in September 2015 when M. Sgt. Fondren issued him a letter of counseling related to a customer complaint that he believed to be fabricated. Plaintiff has failed to adduce any evidence, however, that this event took place as he described it. His Personnel File is devoid of any reference to such a letter, M. Sgt. Fondren has no recollection or record of issuing any letter, and Plaintiff failed to produce any letter or corroborating evidence during discovery. (ECF 26, Fondren Decl., ¶11 at 313.)

Customers did complain to M. Sgt. Fondren about Plaintiff, and M. Sgt. Fondren did raise the issue of customer satisfaction in September 2015 during a performance review. (See id., Ex. I at 330.) That review was overwhelmingly favorable, though. It indicated that Plaintiff needed no improvement meeting the essential elements of his performance plan and rated his duty performance, organizational skills, thoroughness, and communication very highly. M. Sgt. Fondren marked "working with individuals or groups" as an area for some improvement and suggested that Plaintiff "[t]ake time to be more customer focus[ed]" and "[m]ake sure customers know that you are here for them." (Id.)

Plaintiff's claim that he was forced into "alternate employment for lower pay" is contradicted by his own testimony. Plaintiff claimed at deposition that his current pay, including his salary and overseas stipend in Japan, was greater than his previous salary. (ECF 24, Metellus Dep. II, 114:20 – 115:17 at PageID 192.)

IV.     **Conclusion**

Because Plaintiff has no direct evidence of discrimination and because Plaintiff cannot disprove Defendant's stated non-discriminatory reasons as pretext, and because the actions Plaintiff decries do not amount to a hostile work environment, Defendant's Motion for Summary Judgment, ECF 30, is **GRANTED.**

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.   **DONE** and **ORDERED** in Dayton, Ohio, this Friday, May 25, 2018.


s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE